## The Garden Grove Bank v. The Humeston & Shenandoah R'y Co.

1. **Carriers of Goods:** BILL OF LADING: PAROL TO VARY TERMS OF: RIGHT OF BANK ADVANCING MONEY ON TO RELY ON WRITTEN AND PRINTED TERMS. A bill of lading is both a receipt and a contract, and in its character as a contract it is no more open to explanation or alteration by parol than other written contracts. And where a bill of lading made by the defendant to W. provided that the goods should be delivered to the "consignee or owner," but the space designed for the name of the consignee was left blank, and it further provided that the property would be delivered only upon the surrender of the bill of lading, and the bill was assigned to the plaintiff to secure advances made to the shipper, and the defendant, pursuant to an oral understanding with the shipper, of which plaintiff had no notice, consigned the goods to S., who received and disposed of them, so that, when plaintiff presented its bill of lading and demanded the goods, delivery thereof was impossible, *held* that plaintiff had a right to rely upon the terms of the bill of lading, and that, in an action to recover of defendant the amount of its loss, evidence of the oral understanding upon which the goods were shipped to S. was not admissible.

2. **Bill of Lading:** CHARACTER OF CONTRACT: EFFECT OF ASSIGNMENT OF. While a bill of lading is not negotiable, it is assignable, and possesses attributes not common to the ordinary non-negotiable instruments enumerated in § 2084 of the Code. It stands for and represents the property, and an assignment of it passes the title to the property. When issued, it can be altered or changed only upon a surrender of the original, and a collateral oral understanding between the shipper and carrier, by which the property is to be delivered to one not the assignee and holder of the bill, does not follow it into the hands of an assignee without notice, and cannot defeat his rights under the terms of the bill.

*Appeal from Lucas District Court.*

FRIDAY, DECEMBER 11.

THE plaintiff seeks to recover of the defendant the sum of $550 which it advanced upon a bill of lading issued by the defendant upon the shipment of certain walnut lumber, and which bill of lading was assigned to the plaintiff. The right of action is based upon the claim that the defendant failed

to comply with its contract of shipment, and by negligence delivered the lumber to parties not authorized to receive the same, by which plaintiff was damaged in the amount advanced, and interest. There was a trial by jury, and a verdict and judgment for the defendant. Plaintiff appeals.

*T. M. Stuart*, for appellant.

*W. W. Morsman*, for appellee.

ROTHROCK, J.—The facts necessary to a determination of the questions of law involved in the case are not disputed. They are as follows: One Henry Zohn was engaged in buying walnut logs and walnut lumber along the line of the railroad of the defendant, and shipping the same to Chicago. About the twentieth day of August, 1881, he caused three cars to be loaded with said lumber, for shipment, at Van Wert, a station on the defendant's railroad. Zohn was indebted to Wells Bros. in the sum of $550 for this lumber, and on the twenty-third day of August, 1881, before any bill of lading was issued for the shipment of the property, Wells Bros. caused the lumber on said cars to be attached to secure their claim against Zohn. On the same day Wells Bros. and Zohn met at said station, and agreed that the bill of lading should be issued to Wells Bros. as consignors, that they should hold it as security for their claim against Zohn, and that they would take such bill of lading to the Garden Grove Bank, and draw a sufficient amount of money thereon to pay the claim of Wells Bros. The conversation in regard to this arrangement was in the presence of the station agent of the defendant, and he knew, when he issued the bill of lading, that Zohn and Wells Bros. expected and intended to use the same at the Garden Grove Bank to draw or receive money thereon. The said agent thereupon issued and delivered to Wells Bros. a bill of lading, of which the following is a copy:

*1. CARRIERS of goods: bill of lading: parol to vary terms of: right of bank advancing money on to rely on written and printed terms.*

" HUMESTON & SHENANDOAH R. R. Co. BILL OF LADING.

" FREIGHT OFFICE, VAN WEET, August 23, 1881.

" Received from Wells Bros., in apparent good order, by the Humeston & Shenandoah R. R. Co. the following described packages (contents and value unknown) consigned as marked and numbered in the margin, upon the terms and conditions hereinafter contained, and which are hereby made a part of this agreement, also subject to the conditions and regulations of the published tariffs in use by said railroad company, to be transported over the line of this road to Chicago station, and there delivered in like good order to the consignee or owner, at said station, or to such company or carriers (if same are to be forwarded beyond said station) whose line may be considered a part of the route, to the place of destination of said goods or packages; it being distinctly understood and agreed that the responsibility of this company as a common carrier shall cease at the station where delivered or tendered to such person or carrier; but it guaranties that the rate of freight for the transportation of said packages shall not exceed rates as specified below, and charges advanced by this company, upon the following conditions [read the conditions.] The owner or consignee to pay freight or charges as per specified rates upon the goods as they arrive. Freight carried by the company must be removed from the station *during business hours* on the day of its arrival, or it will be stored at the owner's risk and expense; and, in the event of its destruction or damage from any cause while in the depots of the company, either in transit or at the terminal point, it is agreed that the company shall not be liable except as warehousemen. It is agreed, and is a part of the consideration of this agreement, that the company will not be responsible for the leakage of liquors or liquids of any kind; breakage of glass or queensware; the injury or breakage of castings, carriages, furniture, glass show-cases, hollowware, looking-glasses, machinery, musical instruments of any kind, packages of eggs, or picture frames; loss of weight of

coffee, or grain in bags, or rice in tierces; or for any decay of perishable articles; nor for damage arising from effects of heat or cold; nor for loss of nuts in bags, lemons or oranges in boxes, unless covered with canvass; nor for loss or damage of hay, hemp, cotton, or any article the bulk of which renders it necessary to transport it in open cars, unless it can be shown that such loss or damage occurred through negligence or default of the agents of this company. Goods in bond subject to custom-house regulations and expenses. The company is not responsible for accidents or delays from unavoidable cause; the responsibility of this company, as carriers, to terminate on the delivery or tender of the freight as per this bill of lading to the company whose line may be considered a part of the route to the place of the destination of said goods or packages. In the event of loss of any property for which the carriers may be responsible under this bill of lading, the value or cost of the same at the point and time of shipment is to govern the settlement for the same, except the the value of the article has been agreed upon with the shipper, or is determined by the classification upon which the rates are based. And in case of loss or damage of any of the goods named in this bill of lading for which the company may be liable, it is agreed and understood that this company may have the benefit of any insurance effected by or on account of the owner of said goods. This receipt to be presented without erasure or alteration.

| Marks and Consignees. | Car No. | Description of Articles given by Consignee. | Weight, Subject to correction. |
|---|---|---|---|
| | 560 A. & N.... | Walnut lumber..... | 22,000 |
| | 1006 K. S. J. & | | |
| | C. B........ | "        "  ..... | 22,000 |
| | 9450 S........ | "        "  ..... | 22,000 |

"*    *    * Freight to be paid upon the weight by the company's scales, but no single shipment to be rated at less than 100 lbs. Car-load freight subject to the current

rules as to the minimum and maximum weights. Charges advanced, (if any.) *This bill of lading to be surrendered before property is delivered.*

"S. O. CAMPBELL, Freight Agent."

The bill of lading was issued and delivered on the evening of the twenty-third day of August. On the next morning. Wells Bros. and Zohn appeared at the Garden Grove Bank, and requested the cashier to advance them $550 on said bill of lading. He consented to do so. Thereupon Wells Bros. assigned the bill of lading to Zohn, and he assigned the same to C. S. Stearns, cashier of the bank, and at the same time Zohn executed a draft of $550 in favor of said cashier to one J. H. Wallace, of Chicago, and the bill of lading, and draft attached thereto, were delivered to the cashier, in consideration whereof he advanced and paid for said bank to Wells Bros. the sum of $550.

It will be observed that there is no person named as consignee in the bill of lading. The space under the head of "Marks and Consignees" is left blank. The defendant. introduced parol evidence by which it was shown that, when the bill of lading was issued, the name of the consignee was intentionally omitted, because Zohn had not then determined to whom he would ship the lumber. He did not intend to return to Van Wert, and he directed the station agent to ship to Stokes & Son, of Chicago, unless he received other instructions from him by telegraph. No such instructions were received, and, on the next day, being the same day the plaintiff advanced the money on the bill of lading, the agent of the railroad company shipped the lumber consigned to Stokes & Son, to whom the same was delivered, and it was shipped immediately to Canada. The plaintiff forwarded the bill of lading and draft to Chicago, and demanded the lumber of the C., B. & Q. R. Co., the railroad connecting with defendant, and delivery was refused, because a delivery had already been made to Stokes & Son. Wells Bros. knew of the arrangement between the station agent and Zohn, that the

lumber was to be consigned to Stokes & Son unless Zohn should name another consignee; but this arrangement was wholly unknown to the plaintiff until it was too late to prevent the delivery of the lumber to Stokes & Son.

The plaintiff objected to the parol evidence on the ground that it contradicted the written contract as evidenced by the bill of lading. The objection was overruled and the evidence received, and the court instructed the jury as follows: " (4) You are instructed that the bill of lading, as shown upon its face, does not name a consignee, and does not express the full agreement between the parties; and you are instructed that if Zohn and Wells Bros. consented that at the time the way-bills should be made to Stokes & Son, unless the agent should be advised to the contrary, then it was proper for the said agent to ship said lumber to Stokes & Son, and your verdict should be for the defendant. But if there was no such agreement, then the bill of lading is a contract between the parties thereto, whereby said defendant agreed to transfer said lumber to Chicago to Wells Bros. or their assignee. The burden of proof is upon the defendant to establish said agreement. (5) If you find that Wells Bros. and Zohn went to the bank of plaintiff, in order to get money so that Wells Bros.' claim could be satisfied, and you further find that Wells Bros. assigned their interest to said Henry Zohn, that then Zohn drew a draft on Chicago upon said Wallace, which said draft was cashed by the plaintiff, and Zohn then assigned and delivered the bill of lading to the plaintiff, then you are instructed that it was the duty of plaintiffs, in order to protect their rights, to notify the defendant that they were the owners of said bill of lading; and if you find that the defendant shipped said lumber to Stokes & Son, and said consignment was with the consent of Zohn, and he was satisfied with such assignment, and you further find that the defendant did not know that said bill of lading had been assigned to plaintiff, and had no knowledge of plaintiff's

rights, then the plaintiff cannot recover in this action, and your verdict should be for the defendant."

These instructions are complained of by counsel for appellant, and, in connection with the admission of the parol evidence, they present the questions which, in our opinion, are decisive of the rights of the parties. A bill of lading is both a receipt and a contract, and in its character as a contract it is no more open to explanation or alteration by parol than other written contracts. This proposition seems to be conceded by counsel for appellee; and the court below, in the fourth instruction cited above, appears to have been of the opinion that, as the contract did not name any one as consignee, it shows upon its face that it does not express the full agreement between the parties, and the parol evidence was doubtless admitted upon the ground that the contract was partly in writing and partly in parol. It is, however, conceded in the same instruction that, if it was not agreed by parol that Zohn should designate the consignee, then the bill of lading is a contract whereby the defendant agreed to transfer the lumber to Chicago to Wells Bros. or their assignees. We think the proposition that the bill of lading shows on its face that it is an obligation to convey the property to Chicago and deliver to Wells Bros., or their assignees, is correct, and that it is a complete and valid contract not susceptible of explanation by parol, notwithstanding the space left in the instrument for the name of a consignee does not contain the name of any person. It was an obligation to deliver the goods to Chicago to the "consignee or owner." Wells & Co., according to the contract, were consignors, consignees, and owners. In *Chandler v. Sprague*, 5 Metc., 306, it is said: "Ordinarily the name of a consignee is inserted, and then such consignee or his indorsee may receive the goods and acquire a special property in them. Sometimes the shipper or consignor is himself named as consignee, and then the engagement of the ship-owner or master is to deliver them to him or his assigns. Sometimes no person is named; the

name of the consignee being left blank, which is understood to import an engagement on the part of the master to deliver the goods to the person to whom the shipper shall order the delivery, or to the assignee of such person;" citing Abb. Shipp., (4th Amer. Ed.,) 215. See, also, *City Bank v. Railroad Co.*, 44 N. Y., 136; *Low v. De Wolf*, 8 Pick., 101; *Glidden v. Lucas*, 7 Cal., 26. In Hutchinson on Carriers, § 134, it is said: "When there has been no agreement to ship the goods which will make the delivery of them to the carrier a delivery to the consignee, and vest the property in him, the shipper may, even after the delivery to the carrier, and after the bill of lading has been signed and delivered, alter their destination, and direct their delivery to another consignee, unless the bill of lading has been forwarded to the consignee first named, or to some one for his use. [Citing *Blanchard v. Page*, 8 Gray, 285; *Mitchel v. Ede,* 11 Adol. &. E., 888; and other cases.] But, after the carrier or his agent has given one bill of lading or receipt for the goods, he cannot give another, unless the first and all duplicates of the same have been returned to him."

The reason of this rule is obvious. An assignment of a bill of lading operates as a transfer of the title to the property therein described. As is said in *Meyerstein v. Barber*, L. R., 2 C. P., 45: "While the goods are afloat it is common knowledge, and I would not think of citing authorities to prove it, that the bill of lading represents them; and this indorsement and delivery of the bill of lading, while the ship is at sea, operates exactly the same as the delivery of the goods themselves to the assignee after the ship's arrival would do." Now, it is perfectly manifest that if a carrier may issue a second bill of lading without requiring the return of the first, no reliance can be placed upon any such an instrument by those dealing with the consignor with reference to the property. And the same consequences would ensue if he should be permitted, without the surrender of a bill of lading, to ship the property to any one other than that named

in the instrument.   In view of the well-known fact that the
live-stock, grain, and other products of this country are paid
for upon advancements made upon bills of lading, just as was
done in this case, the interests of commerce seem to require
that the rule that no alteration shall be made in contracts of
this character without the production of the original should
be strictly enforced.   The defendant appears to have had due
regard to this rule when preparing its blank bills of lading.
The last provision therein contained, to-wit, "This bill of
lading to be surrendered before property is delivered," was
printed across the face of the instrument.   It is claimed by
counsel that this part of the contract was no part of the
mutual obligation, but that it was a provision for the protec-
tion of the defendant which it might well waive.   It is true,
it could, as it did in this case, deliver the property without
the surrender of the bill of lading.   But it did so at its peril.
This bill of lading was issued with a full knowledge that it
was intended to procure an advancement of money upon it;
but, whether the agent had such knowledge or not, third per-
sons dealing with Wells & Co. were justified in believing
that their assignee would receive the property upon the sur-
render of the instrument.

  It is claimed, however, and the court below seems to have
been of the opinion, that because a bill of lading is not nego-
tiable the defendant had the right to ship the
property to Stokes & Co. by the direction of Zohn,
and is not liable to the plaintiff because it had no
notice that the bill of lading had been assigned to
plaintiff.   It is true that a bill of lading is not negotiable.
It is, however, assignable, and the assignor may maintain an
action thereon in his own name.   It possesses attributes not
common to the ordinary non-negotiable instruments enumer-
ated in section 2084 of the Code.   The instruments there
enumerated are obligations for the payment of money, or prom-
ises to discharge obligations or debts by the delivery of prop-
erty.   Such obligations may be assigned, but they are "sub-

*2. BILL of lading: char- acter of con- tract: effect of assign- ment of.*

ject to any defense or counter-claim which the maker or debtor had against any assignor thereof before notice of his assignments."

It is claimed that the defendant, under this statute, may avail itself of any defense it could have interposed against Zohn, because he was the assignor of the plaintiff. A bill of lading is a different character of instrument. It stands for and represents the property, and an assignment of it passes the title to the property. When issued, it can only be altered or changed, as we have seen, by a surrender of the original, and the contract is that the bill of lading must be surrendered before the property is delivered.

This is a plain contract, which persons dealing with the consignor are justified in believing will be performed. They have also the undoubted right to rely upon the rule that no change can be made in the contract which is issued and sent out into the commercial world, as every business man knows, for the very purpose of using it as the means by which to procure money to move the produce of the country to market. If bankers cannot rely upon bills of lading as being what they plainly import, and in order to protect themselves against private oral agreements between the carrier and the shipper, varying and contradicting the bill of lading, must give notice to the carrier of rights acquired in the property as assignees, it would very seriously embarrass the business interests of the country, and would produce a state of affairs that we think is neither warranted by sound legal principles nor by any consideration of public policy.

We think that the parol evidence should not have been admitted, and that the instructions above set out are erroneous.

REVERSED.